# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

SCOTT M. EKONEN,

     Plaintiff,

*v*.                    CASE NO. 08-CV-13272

COMMISSIONER OF          DISTRICT JUDGE GEORGE CARAM STEEH
SOCIAL SECURITY,        MAGISTRATE JUDGE CHARLES E. BINDER

     Defendant.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Remand be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits.  This matter is currently before the Court on Plaintiff's Motion to Remand pursuant to Sentence Four and Defendant's Motion for Summary Judgment.  (Doc. 8, 14.)  Plaintiff responded to Defendant's motion.  (Doc. 15.)

Plaintiff was 50 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 16 at 19, 71.)  Plaintiff's relevant employment history includes eight year as a loan officer followed by work for the Transportation Security Administration.  (Tr. at 83-84, 591-92.)

Plaintiff filed the instant claim on June 8, 2005, alleging that he became unable to work on October 22, 2004.  (Tr. at 71, 75, 566.)  The claim was denied at the initial administrative stages. (Tr. at 34, 569.)  In denying Plaintiff's claims, the Defendant Commissioner considered heart failure and affective disorders as possible bases of disability.  (*Id.*)

On September 24, 2007, Plaintiff appeared with counsel before Administrative Law Judge ("ALJ") Dennis R. Greene, who considered the instant application for benefits *de novo*.  In a decision dated November 6, 2007, the ALJ found that Plaintiff was not disabled as he could return to his prior work as a loan officer.  (Tr. at 16-26.)  Plaintiff requested a review of this decision on January 4, 2008.

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on June 24, 2008, when, after the review of additional exhibits[2] (Tr. at 574-85), the Appeals Council denied Plaintiff's request for review. (Tr. at 6-8.)   On July 30, 2008, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.      Standard of Review

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious.  *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990).   The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council.  *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  If relief is not found during this administrative review process, the claimant may file an action in federal district court.  *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by

---

[2]In this circuit, when the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).  Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ.  In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence.")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, the court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of the court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

C.     Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II, 42 U.S.C. §§ 401 *et seq.*, and the Supplemental Security Income Program ("SSI") of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the

expiration of their insured status; Title XVI benefits are available to poverty stricken adults and

children who become disabled.  F. BLOCH, FEDERAL DISABILITY LAW AND PRACTICE § 1.1 (1984).

While the two programs have different eligibility requirements, "DIB and SSI are available only

for those who have a 'disability.'"   *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

"Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in death
> or which has lasted or can be expected to last for a continuous period of not less than
> 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity,
> benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of
> impairments that "significantly limits . . . physical or mental ability to do basic work
> activities," benefits are denied without further analysis.

> Step Three:  If Plaintiff is not performing substantial gainful activity, has a severe
> impairment that is expected to last for at least twelve months, and the severe
> impairment meets or equals one of the impairments listed in the regulations, the
> claimant is conclusively presumed to be disabled regardless of age, education or
> work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits
> are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work,
> if other work exists in the national economy that plaintiff can perform, in view of his
> or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920.  *See also Heston,* 245 F.3d at 534.  "If the Commissioner makes

a dispositive finding at any point in the five-step process, the review terminates."  *Colvin,* 475 F.3d

at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work . . . ." *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   Administrative Record

A review of the relevant medical evidence contained in the administrative record and presented to the ALJ indicates that Plaintiff was treated by Rudolfo Son, M.D. (Tr. at 124-249.) At times, he also was treated by D. DeSouza, M.D., Steven J. Wisniewski, M.D., and Patrick M. Maloney, M.D. (Tr. at 235-43, 286-87, 292-303, 473-87.)

Plaintiff was treated at McLaren General Hospital in 1983 and 1987 after an echocardiogram revealed idiopathic hypertrophic subaortic stenosis.[3] (Tr. at 128-29.) Plaintiff's treatment had been changed to include a cardioselective beta blocker medication and he was feeling better. (Tr. at 129.) A chest x-ray taken in 1985 revealed obesity with a very high diaphragm which prevented true cardiac size from being calculated. (Tr. at 132.) No active cardiac disease was noted at that time. (Tr. at 132-34.)

---

[3] Stenosis is defined as the "abnormal narrowing of a body passage, opening, canal, or duct. It is usually due to an overgrowth or shrinkage of the tissue around it." 5 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE S-290.

7

In February 1991, tests indicated Plaintiff had possible cardiac pericardial effusion or cardiomegaly[4] with no signs of congestion or pneumonia in the lungs. (Tr. at 136.)

Plaintiff was taken to the emergency room in January 1992 for upper abdominal pain and underwent a splenectomy. (Tr. at 142-59.) An echocardiogram performed at that time showed "[s]evere concentric left ventricular hypertrophy with markedly diminished left ventricular chamber size and maintained systolic performance[,]" "[s]everely dilated left atrium without thrombus in the left atrial chamber or appendage[,]" a possibility that "the patient could have had a thrombus that embolized[,]" "[m]oderate mitral regurgitation[,]" "[m]ild tricuspid regurgitation[,]" and "[n]o atrial septal defect or patent foramen ovale." (Tr. at 164.)

In June 1992, Dr. Son referred Plaintiff to Dorothea McAreavey, M.D., at the national Institute of Health's Cardiology Clinic. (Tr. at 140.) Dr. McAreavey noted that Plaintiff was diagnosed with hypertrophic[5] cardiomyopathy[6] when he was 21 years old and atrial fibrillation and a murmur. (Tr. at 140.) Dr. McAreavey noted that Plaintiff's "electrocardiogram showed atrial fibrillation with a satisfactory ventricular response rate and poor R-wave progression in V1 to V3." (Tr. at 140.) Dr. McAreavey also noted that, "[a]lthough Mr. Ekonen has hypertrophic cardiomyopathy, he is not severely disabled by it at present." (*Id.*)

---

[4]Cardiomegaly is defined as "1. Enlargement of the heart; the condition of having an enlarged heart. 2. The condition of having a large heart, in proportion to the size of the body, without the generally understood enlargement due to disease of the heart and blood vessels.; i.e., a congenitally large heart." 1 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE C-81.

[5]Hypertrophy is "an abnormal enlargement of a part of an organ due to an increase in the size of its constituent cells. Hypertrophy is usually a compensating mechanism, to enable the organ to perform more work than its normal structure would allow." 3 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE H-256.

[6]Cardiomyopathy is a "disease of the myocardium, the muscular wall of the heart, which is of a noninflammatory nature (involves no inflammation)." 1 J. E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE C-81.

In March 1993, M. Fassihi, M.D., noted that Plaintiff's x-rays indicated that the "cardiothoracic ratio exceeds the upper limits of normal" which "may indicate cardiomegaly." (Tr. at 183.) Cardiomegaly was again diagnosed in testing conducted in October 1997, July 1998, and February 1999. (Tr. at 184, 185, 197.)

In February 1999, Plaintiff was evaluated in the emergency room and admitted to St. Mary's Hospital in Livonia, Michigan, with high blood pressure, a left facial droop and left arm weakness. (Tr. at 186.) An echocardiogram taken at that time revealed "[n]ormal left ventricular size and function; ejection fraction 56 percent[,]" "[m]ild concentric left ventricular hypertrophy[,]" "[m]oderate bilateral enlargement[,]" "[m]ild mitral and tricuspid regurgitation[,]" and "[m]oderate pulmonary hypertension; estimated pulmonary artery systolic pressure of 55 mmHg." (Tr. at 188.) Several days later, the ejection fraction was 65 to 70% and there was "no intracardiac thrombus seen." (Tr. at 193.) A neurological examination did "not show any definite infarction." (Tr. at 189.) A Carotid Duplex Exam was normal. (Tr. at 190.) However, a CT scan showed a "[h]emorraghic infarct [blood clot] on the right side." (Tr. at 192.) Bradley Hubbard, M.D., concluded that "[t]he patient has stroke most likely related to his atrial fibrillation . . . [and noted that] the patient is clearly at risk for recurrent stroke, being in atrial fibrillation." (Tr. at 196.)

In March 1999, an echocardiogram showed "[n]ormal left ventricular size and thickness with normal systolic function," "[s]evere left atrial enlargement with mild right atrial enlargement," "[m]ild to moderate mitral regurgitation," and the "[t]hrombus [blood clot] is visualized in the tip of the left atrial appendage that appears to be protuberant along with a layered thrombus along the wall of the left atrial appendage." (Tr. at 310.)

In May 2005, Plaintiff went to the emergency room at Henry Ford Hospital complaining of chest pain and shortness of breath. (Tr. at 377.) An EKG taken at that time revealed probable

atrial fibrillation, large cardiomegaly and some congestion.  (Tr. at 377.)  The admitting physician's impression was that Plaintiff was suffering from congestive heart failure and atrial fibrillation.  (Tr. at 383.)  An EKG taken at that time indicated "biatrial fibrillation and diffuse nonspecific ST-T changes."  (Tr. at 399.)  In addition, a chest x-ray taken in May 2005 was "consistent with congestive failure."  (Tr. at 425.)  Myocardial imaging ruled out ischemia and noted the presence of "[p]robable fixed defects in the anterior and inferior walls consistent with scars presumably from previous myocardial infarctions" and a "[n]ormal left ventricular ejection fraction of 55%."  (Tr. at 433.)

A Physical Residual Functional Capacity ("RFC") Assessment conducted in September 2005 concluded that Plaintiff could occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and was unlimited in his ability to push and pull.  (Tr. at 260.)  The assessment further found that Plaintiff was occasionally limited in his ability to climb stairs and ladders and to crawl, and frequently limited in his ability to balance, stoop, kneel, and crouch.  (Tr. at 261.)  No manipulative, visual, communicative, or environmental limitations were found other than exposure to hazards.  (Tr. at 262-63.)  The limitations in the assessment differed from the examining source statement in that the "[l]imitations given by the AP are too restrictive considering the claimant's daily activities."  (Tr. at 265.)

A Psychiatric Review Technique conducted in October 2005 concluded that Plaintiff's impairments were not severe, noting the presence of affective disorders and adjustment disorder with depressed mood.  (Tr. at 268, 271.)  As to the "B" criteria, it was concluded that Plaintiff had mild restrictions as to activities of daily living, difficulties in maintaining social functioning, maintaining concentration, persistence, or pace, and no episodes of decompensation.  (Tr. at 278.)

It was also noted that Plaintiff had no history of psychological treatment and was able to care for himself, shop, do chores, and manage money. (Tr. at 280.)

Plaintiff was examined at the request of the Michigan Department of Human Services by Nabil Suliman, M.D., who concluded in June 2005 that Plaintiff's general appearance, musculoskeletal, neurological, and mental capacities were all normal. (Tr. at 248.) Dr. Suliman found his condition to be "deteriorating" but that he was not under even a "temporary disability." (Tr. at 249.) Dr. Suliman noted that Plaintiff would be able to lift up to 10 pounds occasionally and could perform simple grasping and fine manipulating with his right hands and arm. (*Id.*) Dr. Suliman further noted that Plaintiff was able to meet his needs at home without assistance. (*Id.*)

At the request of the Michigan Disability Determination Services, Plaintiff was also examined by Steven Reppuhn, Ph.D., in August 2005 and he prepared a Psychiatric/Psychological Medical Report. (Tr. at 250-56.) Dr. Reppuhn diagnosed Plaintiff with adjustment disorder with depressed mood and mood disorder due to medical conditions at Axis I, deferred on Axis II, noted stroke and congestive heart failure at Axis III, moderate psychological stressors at Axis IV, and a Global Assessment of Functioning ("GAF") of 59. (Tr. at 255.) Dr. Reppuhn concluded that Plaintiff's prognosis was "fair." (Tr. at 256.)

In January 2006, Plaintiff underwent a "[s]uccessful coronary intervention on mid left anterior descending coronary artery using a drug-coated stent." (Tr. at 331, 333-37.) By the end of February 2006, Plaintiff appeared to be "doing fairly well" and began starting cardiac rehabilitation. (Tr. at 297, 353-61.)

In March 2006, a CT scan of Plaintiff's heart "showed [Plaintiff's] heart muscle was strong and it appeared that all parts of [Plaintiff's] heart are getting fed satisfactory [sic]." (Tr. at 292.) However, on examination, Patrick M. Maloney, M.D., noted atrial fibrillation and a heart rate of

80 when resting which rose to 160 when exercising.  (Tr. at 294.)  It was further noted that although Plaintiff had "some transient chest pressure," he "had no increased shortness of breath, edema, or dizziness."  (Tr. at 295.)  In addition, in March 2006, a Nuclear Myocardial Perfusion Study Report showed that while Plaintiff's heart was in atrial fibrillation, and he experienced "[m]ildly reduced motion of the distal septum," "myocardial perfusion images," "ventricular wall thickening," "left ventricular volume," and "ejection fraction" were all normal.  (Tr. at 302.)  An exercise stress test concluded that Plaintiff had "[n]o chest pain but some increased ST changes at 93% of predicted maximal heart rate at 5 mets of activity."  (Tr. at 303.)

In July 2006, Dr. Maloney conducted a series of tests and wrote to Dr. Wisniewski recommending that Plaintiff engage in "[a]gressive risk management," i.e., "trying to achieve a LDL of 70, a regular exercise program of 40 minutes five, if not seven, times a week, getting down to a lean body weight which in his case would probably be less than 170 pounds [from his current weight of 250], complete smoking cessation, and blood pressure control to 120-130/75-80 range."  (Tr. at 473, 475.)  Dr. Maloney ended his remarks stating "[w]e will see how much of this we can change."  (Tr. at 473.)  Attached to this letter, Dr. Maloney included a medical opinion wherein he stated:

> Currently, it is my feeling that this is a gentleman with a variety of problems.  He does have coronary disease with a recent stent but subsequent to this, he now has normal LV systolic function on Cardiolite scan, as well as normal myocardial perfusion images.  I don't believe there is an acute cardiac problem.
>
> He has dyspnea [shortness of breath] on exertion which is likely multifactorial.  He does have atrial fibrillation but he had a good ventricular response with exercise, he has normal LV systolic function on his stress Cardiolite scan.  It is not completely clear to me that all of his dyspnea and fatigue is from a cardiac point of view.  He is deconditioned being 5'7" and weighing 250 pounds.
>
> He also has symptoms of numbness and tingling in his hands and arms which I don't think is all cardiac.  He used to play a lot of football and wonders if he could have

12

some sort of cervical spine disease and I suggested he should follow up with you in regards to this.

He has pain in his legs which could be related to his statins or could be related to peripheral arterial disease and claudication as I don't feel good pulses in his legs. I am going to get NIVAs of his legs to resolve this issue.

He also has a variety of symptoms of headaches and the such of unclear reason to me [sic].

In regards to his disability, I told him I would fill out his forms from a cardiac point of view.  From a cardiac point of view, I don't see why he couldn't sit or stand several hours a day. . . .

From a cardiac point of view, there is no reason why he couldn't do lifting and carrying or grasping or manipulation. . . .

Thus, from a cardiac point of view, I have a hard time accounting for all his symptoms . . . .

A final thought in closing is that he does have significant obesity and there is also the possibility he could have sleep apnea accounting for some fatigue and this issue may also need to be considered to improve his quality of life.

(Tr. at 475-76.)

An examining physician assessment completed by Dr. Wisniewski in July 2006 concluded that Plaintiff could sit, stand or walk for ½ hour without interruption, and sit, stand, walk, or sit/stand as needed for ½ hour in an 8-hour workday, with normal break periods, adding that "leg pain and paresthesias  occur but are relieved with position change."  (Tr. at 363.)  Dr. Wisniewski further found that Plaintiff could lift up to 10 pounds occasionally, carry up to 10 pounds occasionally, perform simple grasping and fine manipulation occasionally," and also added that Plaintiff "gets paresthesias with prolonged grip."  (Tr. at 363-64.)  Dr. Wisniewksi found that Plaintiff could occasionally push and pull 20 pounds with both his right and left hands and that he was not able to use his feet and legs for repetitive tasks.  (Tr. at 364.)  Mild restrictions in environmental areas were also noted.  (Tr. at 365.)  Dr. Wisniewski further found that Plaintiff's

mental abilities and attitude needed to do unskilled work were all good, with the exception of his ability to perform at a consistent pace without an unreasonable number and length of rest periods, and his ability to deal with normal work stress, both of which were deemed fair.  (Tr. at 368-69.) Self-directed activities were recommended.  (Tr. at 369.)  Dr. Wisniewski also concluded that Plaintiff's impairments or  treatment would cause Plaintiff to be absent from work about twice a month. (Tr. at 370.)

In November 2006, Dr. Maloney noted that Plaintiff was not having any angina, light-headedness, or shortness of breath and noted that Plaintiff stated he could "walk around fairly well." (Tr. at 482.)  Plaintiff was working on dieting and had brought his cholesterol down to 130, which Dr. Maloney noted was "pretty good."  (*Id.*)  Plaintiff's blood pressure and pulse were normal and regular, his lungs were clear, and his heart showed "no murmurs, rubs, or clicks," and he had no edema.  (*Id.*)

 Dr. Reppuhn conducted another psychological evaluation in July 2007, wherein he noted major depression, single episode, severe, and history of alcohol dependence in full sustained remission at Axis I, personality disorder, or mixed including paranoid, histrionic, obsessive-compulsive and schizoid characterological traits at Axis II, history of stroke, congestive heart failure and headaches at Axis III, moderately severe psychological stressors at Axis IV, and a GAF score of 55 at Axis V.  (Tr. at 555-56.)   Dr. Repphun concluded that Plaintiff "presents handicapping psychiatric conditions" and "advised [that Plaintiff] obtain a full range of mental health services." (Tr. at 556.)  He further concluded that Plaintiff is a "marginal job prospect in light of his level of psychopathology and personality difficulties [such that] [i]t may be more appropriate for [Plaintiff] to pursue Social Security Disability benefits at this time . . . ."  (Tr. at 556.)

Dr. Wisniewski submitted a medical opinion in August 2007 regarding Plaintiff's ability to do work-related activities wherein he concluded that Plaintiff's abilities and aptitude needed to do unskilled work were all good, except that Plaintiff's abilities to remember work-like procedure, maintain attention for a two-hour segment, perform at a consistent pace without an unreasonable number and length of rest periods, and deal with normal work stress were fair and his ability to maintain regular attendance was poor or none.  (Tr. at 559.)  Dr. Wisniewski explained the limitations were needed because Plaintiff needs to "pace [him]self to [his own level of] tolerance" and thus, "self-directed activity [is] recommended."  (Tr. at 560.)  Dr. Wisniewski further noted that Plaintiff's ability to set realistic goals and make plans independently of others is good but that his abilities to understand, remember, and carry out detailed instructions and deal with stress are fair.  (Tr. at 560.)  Dr. Wisniewski explained that these mental limitations were the result of "depression of [sic] chronic illness and inability to be productive."  (Tr. at 560.)  Dr. Wisniewski estimated that Plaintiff's impairments or treatment would cause him to be absent from work more than three times a week, adding that absences would be "unpredictable."  (Tr. at 561.)  He added that Plaintiff's "decline in stamina is gradually worsening in spite of [plaintiff's] efforts to maintain activity."  (Tr. at 561.)

Dr. Wisniewski also completed another examining physician assessment which found the same limitations that were present in 2006 but added that Plaintiff has "worsening leg pain associated with peripheral neuropathy" and that Plaintiff could no longer carry any weight, supporting this finding with the comment that Plaintiff is "unable to do over 5 feet without increased dyspnea."  (Tr. at 562.)  In addition, Dr. Wisniewski concluded Plaintiff could not bend, twist, reach, etc., because he "has intermittent severe vertigo with movements - not predictable."  (Tr. at 563.)  Due to Plaintiff's "overall breathing problems due to weight/CHF," it was

15

recommended he avoid most environmental factors except noise and automobiles. (Tr. at 564.) Dr. Wisniewski stated that Plaintiff "has decreased stamina due to heart disease[,] decreased mobility due to periph[eral] vasc[ular] disease" and that his subjective complaints were consistent with the objective medical findings because of his "depression due to chronic illness and physical deficit." (Tr. at 565.)

At the administrative hearing, when asked whether he is presently employed, Plaintiff responded, "No, I'm, well, I, I'm, I do, I'm an independent contractor with Demos Express." (Tr. at 592.) Plaintiff testified that he "do[es] demonstrations in supermarkets" which "consists of, of preliminarily a product that, that the manufacturer wants to increase their sales possibility. And it's in a supermarket setting, stand there and give samples out to consumers for six hours . . . pass out samples and show, demonstrate what the product does." (Tr. at 593.) He added he usually only works once a week or every other week and makes about $48 per six-hour demonstration. (Tr. at 594.) He also stated that he needs to recuperate for two days after standing for the six-hour period. (Tr. at 595.) When asked why he cannot work, Plaintiff responded that he "get[s] very tired. I get  headache, headaches during the middle of the day, end of the day." (Tr. at 597.) Plaintiff indicated "they just come on from stress or from, you know, you know, to the duties involved, I guess." (Tr. at 597.) He state he has headaches "every other day" during which he quiets down and lies down. (Tr. at 603.) Plaintiff also testified that he gets sores on his legs that are "very tender and very sore," which he believes occurs because of "poor circulation." (Tr. at 600.) Plaintiff further testified that he suffered an injury to his right hand years ago that affects his ability to grasp with that hand but that he is left-handed. (Tr. at 601.) He also testified that his right foot "drops" such that he "trip[s] over it a lot" from an injury when he was twelve years old. (Tr. at 602.) Plaintiff stated that he is depressed because, "when I'm trying to get jobs, you know,

they can't ask you the question about you know how's your health . . . but I, it usually comes around one way or another . . . why haven't you been working . . . what's wrong with you . . . ." (Tr. at 603-04.)

The ALJ asked the vocational expert ("VE") to consider a hypothetical person with Plaintiff's background and the VE testified that such a person could perform his past relevant work as a loan officer, which is light and sedentary work. (Tr. at 612.) The VE further testified that there are a significant number of unskilled light positions (48,000 total) such as machine tender, counter clerk, light assembler, and line attendant available in the State of Michigan and that there are a significant number of unskilled sedentary jobs (17,400 total) such as bench assembler, sorter, parts checker, and machine attendant available in the region. (Tr. at 612-13.) The VE further testified that if Plaintiff's testimony were deemed fully credible, "that would eliminate competitive employment" because of his "fatigue," i.e., that he has to lie down during the day, and because he stated he was "missing [work] three to four days a month." (Tr. at 613-14.) In addition, if Plaintiff had to recuperate for two days after working six hours, that would also eliminate jobs. (Tr. at 615.) The VE also testified that her findings were consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. at 611.)

Plaintiff stated, as part of his application, that he does his own dishes and laundry, vacuums, cleans the kitchen floors, counters, living room, bathroom, bedrooms and basement, shops for food and clothing around once a week, reads newspapers, magazines and mystery novels, watches television, listens to music, rents movies, does "some fishing," "attend[s] sporting events," "make[s] minor repairs on autos/small engines" with help, visits friends and family, and attends church weekly. (Tr. at 104-06.)

## E.    ALJ Findings

17

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since October 22, 2004. (Tr. at 21.) At step two, the ALJ found that Plaintiff's history of atrial fibrillation, coronary artery disease, obesity, and depression were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (*Id.*) At step four, the ALJ found that Plaintiff has the residual functional capacity to perform his past relevant work as a loan officer and a full range of sedentary work. (Tr. at 22, 25.) Thus, the ALJ found Plaintiff was not disabled. (Tr. at 25.)

### F.   Analysis and Conclusions

### 1.   Return to Prior Work

As noted, the ALJ concluded that Plaintiff had the ability to return to his prior work. (Tr. at 21-22.) This finding ended the ALJ's disability inquiry because Plaintiff could not make out a prima facie showing of disability.

The Commissioner's regulations state that the agency "will first compare our assessment of your residual functional capacity with the physical and mental demands of your past relevant work." 20 C.F.R. § 416.960(b). "If you can still do this kind of work, we will find that you are not disabled." 20 C.F.R. § 404.1520(f). "'By referring to the claimant's ability to perform a "kind" of work, [the regulations] concentrate[] on the claimant's capacity to perform a type of activity rather than his ability to return to a specific job or to find one exactly like it.'" *Boucher v. Apfel*, 238 F.3d 419, 2000 WL 1769520, at *7 (6th Cir. Nov. 15, 2000) (quoting *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995)).

18

In determining the level of exertion required by prior work, the testimony of the VE should be compared to the DOT.[7] *Bauer v. Barnhart*, 168 Fed. App'x 719 (6th Cir. 2006). Simply asking the VE if her testimony is consistent with the DOT satisfies the requirements under Social Security Regulation 00-4p. *Martin v. Comm'r of Social Security*, 170 Fed. App'x 369, 375-76 (6th Cir. 2006).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

## 2.    Substantial Evidence

Plaintiff argues that substantial evidence fails to support the findings of the Commissioner. As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff argues that the ALJ's decision is internally inconsistent as to Plaintiff's claims of disabling mental impairment because Plaintiff "was found to have a 'severe' impairment of Depression, but this 'severe' impairment was rated 'mild' in all three areas, i.e. activities of daily living, social functioning, and concentration." (Doc. 8 at 8.)

Under the sequential evaluation process, if a plaintiff does "not have any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities, we will find that [he or she does] not have a severe impairment and are,

---

[7]I note that the DOT is available on Westlaw (database identifier:  DICOT).

therefore, not disabled." 20 C.F.R. § 416.920(5)(c).  As a result, where an ALJ does not make a specific finding whether a plaintiff had a severe impairment or combination of impairments, courts assume that the ALJ so found if the ALJ proceeds to determine residual functional capacity. *Damron v. Sec'y of Health and Human Servs.*, 778 F.2d 279, 281 n.3 (6th Cir. 1985).  Thus, even if an ALJ had remained silent as to whether a plaintiff had a severe impairment or combination of impairments there would not be a fatal inconsistency in his or her decision, so long as the ALJ determines the residual functional capacity.

The ALJ in the instant case expressly found that Plaintiff's history of atrial fibrillation, coronary artery disease, obesity and depression were severe.  (Tr. at 21.)  The ALJ may properly consider several impairments in combination under 20 C.F.R. § 416.920(5)(c).  Thus, a finding that a mental impairment only mildly limits daily activities, etc., is not inconsistent with a finding that Plaintiff suffers from a combination of impairments that are severe.

The ALJ then went on to consider the "B" and "C" criteria to determine whether Plaintiff's mental impairment met Listing 12.04.  (Tr. at 22.)  The ALJ determined that Plaintiff is only mildly limited in activities of daily living, social functioning, concentration, persistence and pace, and has never experienced any episodes of decompensation; thus, the ALJ concluded that the "B" criteria were not satisfied and Plaintiff could not meet Listing 12.04.  (*Id.*)  I note that a Psychiatric Review Technique conducted in October 2005 supports the conclusion that Plaintiff's mental impairments were not severe.  (Tr. at 268, 271, 278, 280.)

To the extent that the ALJ's conclusion that Plaintiff suffers from an impairment or combination of impairments is inconsistent with his finding that his mental impairment only mildly limits his abilities, I suggest that any inconsistency works in favor of Defendant.  Since the ALJ specifically found that Plaintiff is only mildly limited in activities of daily living, social

functioning, concentration, persistence and pace, the ALJ should have found Plaintiff's depression to be non-severe rather than severe. I therefore suggest that this alleged inconsistency does not exist or, if it does, it militates in favor of Defendant and does not undermine the ALJ's decision.

Plaintiff further contends that although the ALJ found Plaintiff "has a 'severe' impairment of Obesity, [he] did not factor in any type of restriction related to this Obesity." (Doc. 8 at 8.) Plaintiff argues that the ALJ's finding that Plaintiff does not have mechanical limitations as a result of obesity is also "internally inconsistent" with the ALJ's finding that Plaintiff suffers from a severe impairment or combination of impairments. (*Id.*) For the reasons stated above, I suggest such findings are not inconsistent.

Plaintiff's argument that the ALJ did not "factor in" obesity is more relevant to Plaintiff's next argument, namely, that substantial evidence fails to support the decision that Plaintiff has the RFC to perform a full range of sedentary work. (Doc. 8 at 9.) Specifically, Plaintiff argues that avoiding highly stressful environments and the fact that Plaintiff is often irritable and does not like to be around people prevents him from performing full-time sedentary work. (Doc. 8 at 10.) The Plaintiff further argues that the fact that Plaintiff works six hours every two weeks handing out samples to people in grocery stores does not adequately support the ALJ's finding that Plaintiff is able to perform sedentary work. (Doc. 8 at 10.)

I suggest that substantial evidence supports the ALJ's conclusion that Plaintiff is able to return to his past relevant work as a loan officer and retains the RFC to perform sedentary work. Although Plaintiff certainly suffers from atrial fibrillation and coronary artery disease, he has been "doing fairly well" since implantation of the stent in 2006 and cardiac rehabilitation. (Tr. at 297, 331, 333-37, 353-61.) In March 2006, a CT scan of Plaintiff's heart "showed [Plaintiff's] heart

muscle was strong and it appeared that all parts of [Plaintiff's] heart are getting fed satisfactory [sic]." (Tr. at 292.)  Dr. Maloney noted that although Plaintiff "does have coronary disease with a recent stent . . ., he now has normal LV systolic function on Cardiolite scan, as well as normal myocardial perfusion images.  I don't believe there is an acute cardiac problem. . . . I don't see why he couldn't sit or stand several hours a day . . . [and] I have a hard time accounting for all his symptoms." (Tr. at 475-76.)  Moreover, several months later, Dr. Maloney noted that Plaintiff was not having any angina, light-headedness, or shortness of breath and that Plaintiff stated he could "walk around fairly well." (Tr. at 482.)  In addition, Dr. Suliman found that although Plaintiff's condition was "deteriorating," he was not under even a "temporary disability" in 2005, prior to the successful implantation of the stent.  (Tr. at 249.)

Although Plaintiff states that the ALJ failed to properly factor in Plaintiff's inability to handle stress in a work environment, Plaintiff's treating physician, Dr. Wisniewski, twice concluded that Plaintiff's ability to deal with work stress was fair.  (Tr. at 368-69, 559-60.)

The RFC Assessment further supports the ALJ's decision.  (Tr. at 260-65.)  In addition, Plaintiff's own testimony that he is able to stand six hours, once or twice a week, engage the public, pass out samples and demonstrate products, further supports the ALJ's finding.  (Tr. at 592-94.)  Although Plaintiff testified that he needs to recuperate for two days after standing for the six-hour period (Tr. at 595), this would not preclude sedentary work which by definition does not involve standing for six-hour periods.

Finally, I suggest that the ALJ's findings accurately portrayed Plaintiff's individual impairments in harmony with the objective record medical evidence as presented by the treating and examining physicians, as well as the daily activities described by Plaintiff himself that he does his own dishes and laundry, vacuums, cleans the kitchen floors, counters, living room, bathroom,

bedrooms and basement, shops for food and clothing around once a week, reads newspapers, magazines, and mystery novels, watches television, listens to music, rents movies, does "some fishing," "attend[s] sporting events," "make[s] minor repairs on autos/small engines" with help, visits friends and family, and attends church weekly. (Tr. at 104-06.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

Accordingly, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.


III.   **REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the

objections, and shall address specifically, and in the same order raised, each issue contained within

the objections.


                                             s/ Charles E Binder
                                          CHARLES E. BINDER
Dated: April 13, 2009                     United States Magistrate Judge




                              **CERTIFICATION**

        I hereby certify that this Report and Recommendation was electronically filed this date, electronically served upon counsel of record via the Court's ECF System and served on District Judge Steeh in the traditional manner.


Date:  April 13, 2009          By____s/Patricia T. Morris_____
                                    Law Clerk to Magistrate Judge Binder